<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| L.W., | |
| Plaintiff, | Civil Action No. 22-6483 (SDW) (MAH) |
| v. | **OPINION** |
| JERSEY CITY BOARD OF EDUCATION, | April 8, 2024 |
| Defendant. | |

**WIGENTON**, District Judge.

Before this Court is Defendant Jersey City Board Education's ("Defendant" or "JCBE") motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, as well as Plaintiff L.W.'s ("Plaintiff" or "L.W.") cross-motion for summary judgment and motion for sanctions pursuant to Federal Rule of Civil Procedure 11. Jurisdiction is proper under 20 U.S.C. § 1415(i)(2)(A) and 28 U.S.C. § 1331. Venue is proper under 28 U.S.C. § 1391(b). This matter is decided without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons stated below, Defendant's motion for summary judgment is **GRANTED** and Plaintiff's cross-motion for summary judgment and motion for sanctions are **DENIED**.

## I.  BACKGROUND

L.W. grew up in Jersey City, where JCBE is the authority responsible for providing educational services. (D.E. 1 ¶¶ 5, 8.) In this action, L.W. seeks to reverse a New Jersey Office of Administrative Law ("NJOAL") decision, which held that the statute of limitations barred her

claims against JCBE for alleged deficiencies in the provision of educational services. (*See generally id.*)[1]

### A. Factual Background[2]

Born in 1994, L.W. enrolled in the Jersey City School District in the 1999-2000 academic year. (DSUMF ¶¶ 2¬3.) In the 2000-2001 academic year, L.W. was referred for an evaluation to assess her eligibility for special education, which she underwent. (*Id.* ¶ 4; PSUMF ¶ 36.) L.W.'s father E.P. consented to the assessment. (PSUMF ¶ 37.) Upon review of the results, a Child Study Team ("CST") determined that L.W. was ineligible for services. (DSUMF ¶ 4.) E.P. was provided with a Prior Written Notice ("PWN") of the determination, which he did not challenge. (*Id.* ¶ 4; PSUMF ¶ 40.) Included with the PWN was a two-page document regarding levels of educational performance. (PSUMF ¶ 41.) Although E.P. was involved in this process, Superior Court orders dated May 8, 2008 and April 23, 2009 reflected that legal and physical custody of L.W. was to remain with her mother, H.W. (DSUMF ¶ 26.) A 2001 report suggested that H.W. was diagnosed with schizophrenia. (PSUMF ¶ 86.)

On October 9, 2008, the Superior Court ordered JCBE to subject L.W. and her brother to an evaluation with a CST and to increase the frequency of L.W.'s then-existing home instruction. (*Id.* ¶¶ 47, 75.) At the time, JCBE only communicated with H.W., who provided consent for the assessment. (DSUMF ¶¶ 8, 64, 87; PSUMF ¶ 48.) H.W. also confirmed that she received documents regarding Parent Rights in Special Education ("PRISE"). (DSUMF ¶¶ 9, 64.) Thereafter, the assessments were conducted, including a social assessment, a psychological

---

[1] A fulsome background is provided in this Court's prior opinion, which remanded the case to the NJOAL. *See L.W. v. Jersey City Bd. of Educ.*, 17-CV-6451, 2018 WL 3536095 (D.N.J. July 23, 2018).

[2] The factual background is drawn from the parties' statements of material undisputed facts, including the record materials cited therein. (*See* D.E. 30-2 ("DSUMF"); D.E. 36-3 ("PSUMF").) This Court treats a material fact as undisputed if it is uncontested in the parties' responses to the statements (*see* D.E. 36-4; D.E. 45-2), or otherwise supported by "materials in the record," Fed. R. Civ. P. 56(c)(3).

evaluation, an educational assessment, and an audiological evaluation.  (*Id.* ¶¶ 10, 65, 68¬69, 88; PSUMF ¶ 76.)  L.W. understood that the testing was conducted to determine whether she needed help.  (DSUMF ¶ 108.)

Ultimately, notices were addressed to H.W. and L.W., which indicated that a meeting would be held on January 20, 2009 to interpret the results of the evaluation.  (*Id.* ¶¶ 11, 37.)  The notices further stated that the purpose of the meeting was to determine eligibility for special education and related services and, if applicable, to develop an Individual Education Plan ("IEP").  (*Id.* ¶¶ 11, 37, 90.)  Additionally, the notices indicated that documents regarding PRISE were attached (*id.* ¶¶ 11, 37), though there was no proof confirming receipt of these documents (PSUMF ¶ 19).  Likewise, a notice addressed to H.W. stated that the academic, social, and psychological assessment reports were enclosed.  (DSUMF ¶ 12.)  As JCBE was aware, the evaluation placed L.W.'s reading skills at a 2.7 grade-level and her math ability at a 4.4 grade-level.  (PSUMF ¶ 98.)

On January 20, 2009, L.W. attended the meeting to determine her eligibility for special education and related services, along with her therapist from the Division of Youth and Family Services ("DYFS").  (DSUMF ¶¶ 13, 71, 106.)  Michael LoCicero, a case worker with DYFS, attended the meeting as well.  (*Id.* ¶¶ 13, 71.)  According to Mr. LoCicero's case notes, L.W. was informed that "she was going to be provided with extra support and recommended to return to either PS#4 or a school of her choice," and L.W. responded that "she would prefer not attending PS#4 again and asked to be transferred to PS#17."  (*Id.* ¶ 14; PSUMF ¶ 78.)  In later testimony, L.W. acknowledged that this discussion occurred.  (DSUMF ¶ 17.)  Nevertheless, the meeting was adjourned because H.W. was not in attendance due to sickness, and a second meeting was scheduled for January 27, 2009.  (*Id.* ¶¶ 18¬19, 72; PSUMF ¶ 77.)

3

As with the first meeting, notices were addressed to H.W. and L.W. in advance of the second meeting, which indicated that documents regarding PRISE were attached. (DSUMF ¶ 20.) And as with the first notices, there was no proof confirming receipt of these documents. (PSUMF ¶ 19.) Moreover, one of the notices was stamped with the notation, "Copy for DYFS." (*Id.* ¶ 20.)

On January 27, 2009, L.W. attended the second meeting to determine her eligibility, alongside her therapist, Mr. LoCicero, and a Youth Counseling Services manager who emphasized the importance of L.W. leaving PS#4. (DSUMF ¶¶ 22, 74, 106; PSUMF ¶¶ 81–82.) At the time, L.W. was found eligible for special education and related services due to a specific learning disability, and an IEP was drafted. (DSUMF ¶¶ 23, 75; PSUMF ¶¶ 50–51, 80.) As a result, JCBE was aware that L.W. "functioned in the borderline range of overall cognitive development" and "would need special education support with accommodations and modifications." (PSUMF ¶¶ 97, 118.) However, H.W. was not physically present at the meeting, hung up the phone when contacted to participate, and did not answer subsequent calls that day. (DSUMF ¶ 74; PSUMF ¶ 84.) L.W. testified that she could not recall these events (DSUMF ¶ 28), and there was no documentation of any phone calls, correspondence, or home visits to L.W.'s parents after the meeting (PSUMF ¶¶ 52, 54–55), including documentation that would confirm L.W.'s IEP was sent to her parents (*id.* ¶ 53). Likewise, Mr. LoCicero testified that, if L.W. had received an IEP at the meeting, this fact would have been recorded. (*Id.* ¶ 5.) Nevertheless, L.W. was aware that her brother was receiving special services around this time, and H.W. signed an IEP for L.W.'s brother, as well as an acknowledgment of the PRISE information. (DSUMF ¶ 33.) Similarly, H.W. provided the CST with a form excusing herself as an IEP member, as well as a form entitled "Participation as a Member of the IEP Team." (PSUMF ¶ 83.) Meanwhile, JCBE maintained the position that DYFS should obtain guardianship of L.W. in the Superior Court in order to consent

to the IEP (*id.* ¶ 93), though no further action was taken to obtain such consent (DSUMF ¶ 44). During home visits by DYFS, H.W. was invariably present.  (PSUMF ¶ 59.)

On February 5, 2009, L.W.'s IEP was sent to Mr. LoCicero, along with a letter stating that "the district [could] not implement [the] IEP" and was "left with no choice but to continue L.W.'s program of home instruction for the balance of the 2008-09 school year."  (DSUMF ¶¶ 29, 39.)  Indeed, the letter advised that the Jersey City School District could neither implement the IEP absent consent nor challenge the lack of consent in court, and a case note stated that the case was closed due to a lack of consent.  (*Id.* ¶¶ 40–41, 77.)  In all, JCBE communicated to DYFS that two choices were available: either H.W. could sign the IEP, which would be implemented at PS#4, or home instruction would continue for the remainder of the school year.  (PSUMF ¶¶ 23, 56.)  In later testimony, Mr. LoCicero recalled his "ongoing efforts to get [H.W.] to cooperate" and his "efforts to get [L.W.] to cooperate," though he could not recall other specific actions that he undertook in response to the absence of consent.  (DSUMF ¶ 30.)  Nor did JCBE directly send L.W.'s IEP or otherwise make direct contact with, or submissions to, the Superior Court.  (PSUMF ¶¶ 26, 32–33.)  Instead, DYFS conveyed to the Superior Court that L.W. attended an open house in preparation for high school, which she would begin the following year.  (*Id.* ¶ 28.)  The Superior Court was also provided with a report that L.W. had been evaluated by the CST.  (DSUMF ¶ 104.)

Throughout the 2008-2009 academic year, L.W. was regularly provided with home instruction.  (PSUMF ¶¶ 58, 73.)  Then, at the start of the 2009-2010 academic year, Mr. LoCicero was replaced by Luqman Ahmad, another DYFS case worker who was aware of L.W.'s IEP.  (DSUMF ¶¶ 43, 100–01; PSUMF ¶ 99.)  According to Mr. Ahmad's case notes, L.W. expressed that she did "not want to go to school" and instead "want[ed] home instruction."  (DSUMF ¶ 45.)  L.W. had expressed hesitation about attending her school as early

as April 17, 2008, and she again objected to regular class instruction during the January 27, 2009 meeting.  (*Id.* ¶¶ 83, 94.)  For example, case notes from the meeting reflected that L.W.'s request for home instruction was rejected.  (PSUMF ¶¶ 87–88.)  For both L.W. and DYFS, then, continuation of home instruction was the preferred outcome.  (*Id.* ¶ 74.)  However, home instruction was not authorized beyond 2008-2009, and L.W. was scheduled to begin high school in the 2009-2010 as a general education student.  (DSUMF ¶¶ 46, 49, 79.)  Thus, JCBE assigned L.W. to take general education high school classes.  (PSUMF ¶ 96.)  JCBE did not provide a PWN before moving L.W. to general education or when refusing to change L.W.'s educational placement to home instruction.  (*Id.* ¶¶ 10–11.)  Thereafter, around October or November of 2009, L.W. stopped attending school.  (DSUMF ¶ 51; PSUMF ¶ 102.)  L.W. initially stopped attending PS#4 in March 2008.  (PSUMF ¶ 46.)

On May 13, 2010, L.W. was removed from the school roster based on a purported lack of attendance.  (DSUMF ¶¶ 45, 52, 80; PSUMF ¶ 108).  At the time, L.W. was sixteen years old.  (DSUMF ¶ 52; PSUMF ¶ 108.)  According to Mr. Ahmad's case notes, H.W. acknowledged that L.W. may have been removed from the rolls. (DSUMF ¶ 53.)  Likewise, Mr. Ahmad's case notes reflected that he told L.W. she had been removed from the school roster.  (*Id.* ¶ 54.)  Nevertheless, JCBE did not provide a PWN when it removed L.W. from the rolls.  (PSUMF ¶ 12.)  Furthermore, L.W. was never re-registered for school and no claim was subsequently filed by her or H.W.  (DSUMF ¶¶ 55–56.)  Instead, L.W. acknowledged that she moved out of Jersey City in 2011 and began to reside in Parsippany.  (*Id.* ¶¶ 61, 80.)  L.W. later filled out an intake form for a homeless shelter in Morris Plains.  (PSUMF ¶ 60.)

On December 19, 2016, L.W. filed a due process petition against JCBE for violations of the Individuals with Disabilities Education Act ("IDEA"), the Rehabilitation Act ("RA"), the

Americans with Disabilities Act ("ADA"), and New Jersey law.  (DSUMF ¶ 1; PSUMF ¶ 114.)  At no point prior to this date did L.W. or H.W. initiate a due process petition or request for mediation against JCBE.  (DSUMF ¶ 57.)  Likewise, L.W. acknowledged that she did not seek additional services prior to the filing of the due process petition.  (*Id.* ¶ 62.)

### B.  Procedural Background

On May 30, 2017, the NJOAL rendered a decision on cross-motions for summary judgment filed by the parties.  (D.E. 26-1 at 372–86.)  In the decision, Administrative Law Judge ("ALJ") Ellen S. Bass found that the due process petition was untimely under the IDEA's two-year statute of limitations because there were "several points in time where L.W.'s parents knew or should have known (KOSHK) that her rights ostensibly were being violated," and each point occurred more than two years before the filing.  (*Id.* at 380.)  ALJ Bass further found that "until [L.W.] reached the age of majority it is irrelevant what [she] knew or should have known, because the IDEA required that her parents advocate on her behalf."  (*Id.* at 381.)  Finally, ALJ Bass found that the exceptions to the statute of limitations did not apply because JCBE "communicate[d] repeatedly with the adults responsible for L.W."  (*Id.* at 383.)  Since the due process petition was untimely, the NJOAL dismissed the claims against JCBE.  (*Id.* at 384.)  The NJOAL decision only extended to the IDEA claims, not the other federal law claims.  (*Id.* at 373.)

On August 27, 2017, L.W. sought reversal of the NJOAL decision by filing a complaint against JCBE in this Court.  (*Id.* at 387–438.)  However, on July 23, 2018, this Court denied the parties' cross-motions for summary judgment.  *See L.W.*, 2018 WL 3536095.  In issuing the denial, this Court found that there was "a genuine issue of material fact as to who was authorized to advocate for L.W.'s IDEA rights."  *Id.* at *5.  Specifically, this Court found:

> [I]n 1999, H.W. and E.P. shared legal and physical custody of L.W., but E.P. was
> given sole authority to make educational decisions for L.W. . . . There is no order

in the record that revokes that authority. Later orders from the New Jersey Superior Court suggest that, during different periods, DYFS or H.W. had legal custody of L.W. (without clarifying what legal rights or responsibilities E.P. had). Unfortunately, gaps in the record fail to explain exactly how and when those transitions occurred or what effect they had on prior orders.

*Id.*  Additionally, this Court found that even if "L.W.'s parents had legal authority to assert her rights, their mental health and addiction issues and the chaotic nature of their lives raise[d] questions as to whether 1) they were aware of the evaluation process, and 2) they were capable of advocating for her." *Id.*  In other words, genuine issues of material fact existed as to whether H.W. or E.P. knew or should have known about the IDEA claims.  Thus, this Court remanded the case to the NJOAL for a due-process hearing. *Id.* at *6.

On August 9, 2022, the NJOAL rendered a decision on remand.  (D.E. 26-2 at 116–157.) In the decision, ALJ Barry E. Moscowitz summarized the extensive factual record, including testimony that L.W., Mr. LoCicero, and Mr. Ahmad offered at the due-process hearing.  (*Id.* at 119–143.)  Ultimately, ALJ Moscowitz concluded that: (1) "L.W. did not have standing to make her claims under the IDEA until she turned eighteen and the parental rights transferred to her" (*id.* at 146); (2) "the statute of limitations bar[red] L.W. from making those claims" (*id.* at 147); and (3) "the exceptions to the statute of limitations d[id] not apply" (*id.* at 152).  According to ALJ Moscowitz, the statute of limitations barred L.W. from making her claims because "the latest she knew or should have known of the alleged action that forms the basis of her complaint was in 2012, the year she turned eighteen" (*id.* at 146), while the latest H.W. should have known of the alleged action was "in 2010, when L.W. was unenrolled from the school" (*id.* at 150).  Moreover, ALJ Moscowitz found that exceptions to the statute of limitations did not apply because L.W. and H.W. received notices for the January 2009 meetings, as well as the PRISE and the IEP, but H.W. refused to consent to special education and related services, and L.W. refused to attend school,

even though DYFS provided regular assistance.  (*Id.* at 148–49.)  Finally, ALJ Moscowitz found that JCBE was under no obligation to provide any additional process after consent was refused, and that home instruction was never part of any IEP.  (*Id.* at 149–50.)

On November 6, 2022, L.W. once again sought reversal of the NJOAL decision by filing this action against JCBE.  (D.E. 1.)  L.W. sought relief from JCBE for violations of various substantive and procedural requirements under the IDEA (*id.* ¶¶ 148–20); failure to communicate, failure to accommodate, and discrimination under the ADA (*id.* ¶¶ 221–34); discrimination and retaliation under the RA (*id.* ¶¶ 235–41); discrimination and retaliation under the New Jersey Law Against Discrimination ("NJLAD") (*id.* ¶¶ 242–44); and denial of procedural due process (*id.* ¶¶ 245–56).

On September 22, 2023, Defendant filed a motion for summary judgment.  (D.E. 30.)  On October 12, 2023, Plaintiff filed opposition to Defendant's motion, as well as a cross-motion for summary judgment.  (D.E. 42.)  On November 3, 2023, Defendant filed opposition to Plaintiff's cross-motion, as well as a reply in support of its own motion.  (D.E. 45.)  And on November 17, 2023, Plaintiff filed a reply in support of her own motion.  (D.E. 49.)

Separately, Plaintiff filed a motion for sanctions on December 12, 2023.  (D.E. 53.)  In support of the motion, Plaintiff argued that Defendant engaged in sanctionable conduct by offering factual and legal misrepresentations in its opposition and reply on summary judgment.  (*See* D.E. 53-1.)  Defendant filed opposition on January 5, 2024 (D.E. 55), and Plaintiff filed a reply on January 12, 2024 (D.E. 56).

## II.   **LEGAL STANDARD**

### A. **Administrative Appeal**

Under New Jersey law, the "process for resolving disputes arising in special education

cases starts with mediation." *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260,

266 (3d Cir. 2003) (citing  N.J.A.C. § 1:6A–4.1).   If mediation does not succeed, the case is

forwarded to the NJOAL and assigned to an ALJ.  *Id.*  Once the ALJ renders a decision, any party

has the right to appeal to a district court.  *Id.*  The reviewing court "shall receive the records of the

administrative proceedings; shall hear additional evidence at the request of a party; and basing its

decision on the preponderance of the evidence, shall grant such relief as the court determines is

appropriate."  20 U.S.C. §§ 1415(i)(2)(C)(i)-(iii).

On appeal, the district court must engage in a "modified de novo review," affording "due

weight and deference to the findings in the administrative proceedings."  *D.K. v. Abington Sch.

Dist.*, 696 F.3d 233, 243 (3d Cir. 2012) (citations omitted).  If the court disagrees with the

NJOAL's factual findings, it must give an explanation as to why.  *Id.*  Similarly, the court must

accept the ALJ's credibility determinations with respect to live testimony, unless non-testimonial

evidence would justify a contrary conclusion.  *Id.*  On the other hand, review of the ALJ's legal

conclusions, such as application of the statute of limitations, are subject to plenary review.  *P.P.

ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009).

### B. **Summary Judgment**

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if the

"depositions, documents, electronically stored information, affidavits or declarations, stipulations

. . . admissions, interrogatory answers or other materials" demonstrate that there is no genuine

dispute as to any material fact, and, construing all evidence and inferences in a light most favorable

to the non-moving party, "the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A factual dispute is genuine if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006).

At summary judgment, "the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Brooks v. Kyler*, 204 F.3d 102, 105 n.5 (3d Cir. 2000). The moving party bears the burden of identifying evidence to show that there is no genuine issue for trial. *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party satisfies this burden, the non-moving party must "counter with specific facts which demonstrate that there [is] a genuine issue for trial." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996). Importantly, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

### C. Sanctions

Federal Rule of Civil Procedure 11 "imposes on any party who signs a pleading, motion, or other paper . . . an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing." *Bus. Guides, Inc. v. Chromatic Commc'ns Enterprises, Inc.*, 498 U.S. 533, 551 (1991). The well-established legal standard to evaluate alleged violations of this requirement is "reasonableness under the circumstances," which remains "within the sound discretion of the District Court." *Brubaker Kitchens, Inc. v. Brown*, 280 F. App'x 174, 185 (3d Cir. 2008). Reasonableness is "an objective knowledge or belief at the time of the filing of a challenged paper

that the claim was well-grounded in law and fact." *Ford Motor Co. v. Summit Prods. Inc.*, 930 F.2d 277, 289 (3d Cir. 1991) (citations omitted).

Courts may impose an "appropriate sanction" for violations of Federal Rule of Civil Procedure 11. Fed. R. Civ. P. 11(c). Although sanctions are intended to deter frivolous filings to prevent misuse of judicial resources, they should be issued "only in the exceptional circumstance where a claim or motion is patently unmeritorious or frivolous." *Doering v. Union Cnty. Bd. of Chosen Freeholders*, 857, F.2d 191, 194 (3d Cir. 1988) (citations omitted). "Courts . . . have denied sanctions where the law and facts, even if not adopted by the court, are ambiguous and could be reasonably interpreted in more than one way." *In re Cendant Corp. Derivative Action Litig.*, 96 F. Supp. 2d 403, 405 (D.N.J. 2000) (citations omitted).

## III.   **DISCUSSION**

### A. **Defendant's Motion for Summary Judgment**

In support of its motion for summary judgment, Defendant argues that the administrative decision reached below should be upheld on appeal. (D.E. 30-3; D.E. 45.) Specifically, Defendant argues that Plaintiff did not have standing to bring her IDEA claims until she was eighteen, that these claims were untimely when brought, and that no exceptions to the statute of limitations applied. (D.E. 30-3 at 11–30; D.E. 45 at 6–19.) Furthermore, Defendant argues that Plaintiff's ADA, RA, and NJLAD claims cannot be considered on a separate basis, and that in any event, these claims are untimely. (D.E. 30-3 at 20–21; D.E. 45 at 39–43.) As to Plaintiff's procedural due process claim, Defendant argues that ALJ Moscowitz properly considered the issue of parental authority and concluded that H.W. could advocate for L.W. on the basis of the testimony presented to the NJOAL. (D.E. 45 at 43–44.) And statutes of limitations aside, Defendant argues that the

evidence demonstrates its compliance with the various substantive and procedural requirements of the IDEA. (*Id.* at 19–39.)

Each argument will be considered in turn.

### i.     IDEA

"The IDEA protects the rights of disabled children by mandating that public educational institutions identify and effectively educate these children, or pay for their education elsewhere if they require specialized services that the public institution cannot provide." *D.K.*, 696 F.3d at 244 (quoting *P.P.*, 585 F.3d at 735). Under this rubric, local education agencies are required to (1) identify children in need of special education services, and (2) provide them with a free appropriate public education ("FAPE"). *Id.* at 244; *see also* 20 U.S.C. § 1412(a)(3)(A) ("All children with disabilities residing in the State . . . who are in need of special education and related services, are identified, located, and evaluated."); 20 U.S.C. § 1412(a)(1)(A) ("A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21."). A FAPE "consists of educational instruction specially designed to meet the unique needs of the . . . child, supported by such services as are necessary to permit the child to 'benefit' from the instruction." *S.H.*, 336 F.3d at 264 (quoting *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 756 (3d Cir. 1995)). A state provides a FAPE by means of an IEP. *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 198 (3d Cir. 2004); *see also Susan N.*, 70 F.3d at 756 ("The primary mechanism for delivering a free appropriate education is the development of a detailed instruction plan, known as an [IEP] for each child classified as disabled."). In New Jersey, the IEP is developed by a CST along with "parents, a teacher familiar with the students, and other personnel." *Shore*, 381 F.3d at 198-99, 264-65.

As discussed, Plaintiff alleges that Defendant violated not only the substance of the IDEA, but also various procedural requirements.  However, when an alleged IDEA violation is the subject of an administrative proceeding, "a decision made by a hearing officer shall be made on substantive grounds based on a determination of whether the child received a [FAPE]."  20 U.S.C. § 1415(f)(3)(e)(i).  Moreover, a district court cannot review an alleged IDEA violation until the administrative process has been complete.  *Komninos by Komninos v. Upper Saddle River Bd. of Educ.*, 13 F.3d 775, 778 (3d Cir. 1994).  Therefore, "[a] procedural violation is actionable under the IDEA only if it results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits."  *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 565 (3d Cir. 2010).   Additionally, an IDEA violation is only actionable if it is litigated within a two-year period whose accrual is governed by the discovery rule.  *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 613 (3d Cir. 2015).  Indeed, a parent may file a complaint regarding deficiencies in the provision of educational services, 20 U.S.C. § 1415(b)(6)(A), and such a filing triggers an impartial due process hearing.  20 U.S.C. § 1415(f)(1)(A).  Nevertheless, the parent must "request an impartial due process hearing within 2 years of the date the parent . . . knew or should have known about the alleged action that forms the basis of the complaint."  20 U.S.C. § 1415(f)(3)(C).

Here, L.W.'s claims are untimely under the IDEA because H.W. knew or should have known about JCBE's alleged failure to provide a FAPE more than two years before the due process petition was filed.  Similarly, H.W. should have discovered any alleged loss of educational opportunity, serious deprivation of participation rights, or deprivation of educational benefits within this period.  First, in October 2008, H.W. consented to L.W.'s evaluation and received documents regarding PRISE.  Second, a notice addressed to H.W. indicated that a meeting would

be held on January 20, 2009 to interpret the results of the evaluation, determine eligibility for special education and related services, and develop an IEP.  Third, after the meeting was adjourned because H.W. was not in attendance due to sickness, another notice was addressed to H.W. for a meeting to be held on January 27, 2009.  Importantly, both notices addressed to H.W. indicated that documents regarding PRISE were attached, and a notice also stated that evaluation reports were enclosed.  Fourth, H.W. was not physically present at the meeting, hung up the phone when contacted to participate, and did not answer subsequent calls that day, but H.W. provided the CST with forms regarding excusal and participation in the IEP.  Fifth, H.W. was invariably present during home visits by DYFS personnel, who received the IEP, were aware of the need for consent, and made ongoing efforts to get H.W. to cooperate.  Sixth, H.W. signed an IEP for L.W.'s brother, as well as an acknowledgment of the PRISE information.  Seventh, H.W. acknowledged that L.W. may have been removed from the rolls around May 2010, but L.W. was never re-registered and no claim, due process petition, or request for mediation was ever filed by H.W.  Plainly, at numerous junctures between October 2008 and May 2010, H.W. knew or should have known about JCBE's alleged failure to provide a FAPE, or any other alleged educational or serious participation issues, but she either failed to discover such issues or chose not to pursue relief.[3]  Therefore, ALJ Moscowitz correctly determined that the statute of limitations barred the due process petition, which was filed by L.W. in December 2016.[4]

---

[3] Even if H.W. could not have known about the ineligibility determination in 2001, by the time she was involved in the evaluation process in 2008 and 2009, she knew or should have known about any alleged failure to provide a FAPE, or any other educational or serious participation issues.  In any event, the evidence suggests that E.P. had authority over educational decisions in 2001 (*see* D.E. 37 at 102–03), and he certainly knew or should have known about the ineligibility determination and the underlying evaluation process.

[4] To be sure, the record contained gaps.  For instance, no proof confirmed H.W.'s receipt of the notice documents, DYFS appeared to be the intended recipient of a notice, no documents or records confirmed that the IEP was sent to H.W. after the second meeting, a DYFS employee could not recall specific actions

Even if the analytic focus of the discovery rule is shifted from H.W. to L.W., ALJ Moscowitz's determination remains correct.  Therefore, this Court need not decide whether L.W. could have filed the due process petition before she turned eighteen, or whether the statute of limitations was tolled until such time.  Indeed, by the time L.W. turned eighteen, she knew or should have known about JCBE's alleged failure to provide a FAPE, or any other alleged educational or serious participation issues.  For one, the meeting notices addressed to H.W. were likewise addressed to L.W., who was similarly aware that her brother was receiving special services.  Additionally, L.W. underwent an evaluation, understood that the assessments were conducted to determine whether she needed help, and attended the January 2009 meetings, where she learned that she would receive extra help, initially asked to be transferred to another school, subsequently objected to classroom instruction, and was ultimately rejected for home instruction.[5] Moreover, L.W. received support from a therapist who attended the meetings, a counseling professional who appreciated the importance of a school transfer, and DYFS personnel who understood and shared her preference for home instruction over classroom instruction, but who also received the IEP, appreciated its terms, and made efforts to obtain her cooperation.  Finally, L.W. stopped attending school around October or November of 2009, was informed by DYFS that she was removed from the school roster in May 2010, and moved out of Jersey City in 2011.  These facts suggest that L.W. was aware of the educational options that were available and unavailable to her, but that she chose to remain out of school and leave town, rather than seek additional services or litigate alleged deficiencies in her educational options.

---

that he undertook in response to the absence of consent, and H.W. may have suffered from schizophrenia throughout this time.  Nonetheless, based on the totality of the evidence, the NJOAL could have found that H.W. was aware of the IEP and that her participation was repeatedly solicited.  In particular, the fact that H.W. signed an IEP for L.W.'s brother's could have suggested that she possessed the relevant awareness.
[5] While L.W. could not recall certain aspects of H.W.'s abstention from the second meeting, she appeared to recall other relevant aspects of the meetings.

Before addressing possible exceptions to the statute of limitations, it is noted that ALJ Moscowitz did not offer an adequate analysis of who was authorized to advocate for L.W.'s IDEA rights, even though this question was a subject of the remand.  Instead, ALJ Moscowitz merely found that H.W. had authority over L.W.'s education because the May 8, 2008 and April 23, 2009 Superior Court orders reflected H.W.'s custody of L.W. and "[n]othing in the record indicate[d] otherwise." (D.E. 26-3 at 119–20.)  However, this Court already found that these Superior Court orders were insufficient because the record included further indication that E.P. had sole authority over L.W.'s education in 1999, and there was no explanation of any subsequent revocation or transition.  Nevertheless, this Court will not reverse ALJ Moscowitz's determination because the testimony offered at the due process hearing could have supported the conclusion the H.W. was authorized to advocate for L.W.'s IDEA rights.  In particular, the fact that H.W. signed an IEP for L.W.'s brother could have suggested that she possessed the relevant decision-making authority.

Notwithstanding the possible untimeliness of her IDEA claims, L.W. argues that the exceptions to the statute of limitations lifted the bar on her due process petition.  (D.E. 42-2 at 24–32; D.E. 49 at 7–12.)  Under the IDEA, the statute of limitations

> shall not apply to a parent if the parent was prevented from requesting the hearing due to — (i) specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint; or (ii) the local educational agency's withholding of information from the parent that was required under this subchapter to be provided to the parent.

20 U.S.C. § 1415(f)(3)(D).  In order to utilize the first exception, a plaintiff carries the burden to demonstrate "that the school *intentionally* misled them or *knowingly* deceived them regarding their child's progress."  *D.K.*, 696 F.3d at 246 (emphasis added).  In order to utilize the second exception, a plaintiff carries the burden to demonstrate "[a] failure to supply *statutorily mandated*

disclosures." *Id.*  Under both exceptions, "a plaintiff must also show that the misrepresentations or withholding *caused* her failure to request a hearing or file a complaint on time." *Id.*

Here, L.W. has not met her burden under either exception to the statute of limitations because she has not established that JCBE intentionally misled or knowingly deceived her parents, or that any specific misrepresentation or withholding of information caused the untimely filing of her due process petition.  Each exception will be addressed in turn.

### a.  *Specific Misrepresentations*

L.W. argues that JCBE made specific misrepresentations because it appreciated that she could not succeed in a general education environment, failed to update the Superior Court on the outcome of the evaluation process, and suggested to DYFS that home instruction would not remain in place upon the filing of a due process petition.  (D.E. 42-2 at 30–32; D.E. 49 at 10–12.) However, the Superior Court was updated on at least certain developments, and JCBE did not make any suggestion to DYFS about the status of home instruction upon the filing of a due process petition.  Instead, JBCE communicated to DYFS that home instruction would continue for the remainder of the year in the event that H.W. did not sign the IEP.  Even if this communication somehow misled or deceived DYFS about L.W.'s progress, there is no proof that JCBE intended or knew such a result would occur, especially vis-a-vis L.W.'s parents.  Nor is there proof that JCBE intentionally misled or knowingly deceived L.W.'s parents when it reported ineffectively to, or took insufficient action in, the Superior Court.  Likewise, there is no proof that these alleged specific misrepresentations caused the untimely filing of L.W.'s due process petition.  Therefore, ALJ Moscowitz correctly determined that this exception to the statute of limitations did not apply.

### b.   Withholding of Information

L.W. argues that JCBE withheld information because it did not provide PWNs,[6] eligibility notices,[7] or transfer-of-rights notices[8] at various points throughout her education.  (D.E. 42-2 at 24–30; D.E. 49 at 7–10.)  As an initial matter, this Court notes that E.P. received a PWN in connection with the 2001 ineligibility determination and that notices were addressed to H.W. in 2009 regarding L.W.'s evaluation and eligibility.  Although no proof confirmed H.W.'s receipt of the notices, L.W. carries the burden to prove that JCBE withheld information, not vice versa.  And the speculative possibility of non-mailing cannot sustain this burden, notwithstanding the "Copy for DYFS" notation stamped onto one of documents.  Even if JCBE did not provide eligibility notices, there is no proof that this failure caused the untimely filing of L.W.'s due process petition.  Similarly, there is no proof that failure to provide PWNs or transfer-of-rights notices caused a delay.[9]  To the contrary, the evidence suggests that H.W.'s and L.W.'s actions would have remained unchanged by the alleged withheld information, as H.W. declined participation in the IEP process, L.W. stopped attending school, and both H.W. and L.W. were aware that another member of their family was receiving special education and related services.  Therefore, ALJ Moscowitz correctly determined that this exception to the statute of limitations did not apply.

---

[6] The IDEA requires that PWNs be shared with parents "whenever the local educational agency—(A) proposes to initiate or change; or (B) refuses to initiate or change, the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child." 20 U.S.C. § 1415(b)(3).

[7] The IDEA requires that "a copy of the evaluation report and the documentation of determination of eligibility" be shared with parents "[u]pon completion of the administration of assessments and other evaluation measures."  20 U.S.C. § 1414(b)(4)(B).

[8] The IDEA and New Jersey law require local educational agencies to notify children that all rights accorded to their parents transfer to them upon their eighteenth birthday. 20 U.S.C. § 1415(m)(1)(B)-(C); N.J.A.C. § 6A:14-2.3(m).

[9] In light of this absence of evidence, this Court need not decide whether PWNs were required when L.W. was rejected for home instruction, moved to general education, or removed from the rolls, or whether the transfer-of-rights notice could have been provided after L.W. moved out of Jersey City before her eighteenth birthday.

Since the statute of limitations bars L.W.'s due process petition and the exceptions to the statute of limitations do not apply, this Court need not decide whether the evidence demonstrates JCBE's compliance with the various substantive and procedural requirements of the IDEA.

## ii.      *ADA, RA, NJLAD*

The Third Circuit has held that the IDEA statute of limitations governs "claims made for education" under the RA.  *P.P.*, 585 F.3d at 737.  Courts in this district regularly cite this holding to apply the IDEA statute of limitations to ADA and RA claims for failure to accommodate, discrimination, and retaliation, so long as such claims are "entirely premised" on the denial of educational services.  *See e.g., Estate of S.B. by & through Bacon v. Trenton Bd. of Educ.*, 17-CV-07158, 2018 WL 3158820, at *6 (D.N.J. June 28, 2018); *E.E. v. Ridgefield Park Bd. of Educ.*, CV 19-CV-1221, 2020 WL 3097473, at *8 (D.N.J. June 11, 2020), *aff'd Esposito v. Ridgefield Park Bd. of Educ.*, 856 Fed. Appx. 367 (3d Cir. 2021).  Here, L.W. brings ADA and RA claims for failure to accommodate, discrimination, and retaliation that are entirely premised on the denial of educational services.  (D.E. 1 ¶¶ 221–56).[10]  Therefore, the IDEA statute of limitations applies to such claims, which are barred as untimely.[11]  Furthermore, without federal causes of action remaining, this Court cannot exercise jurisdiction over the NJLAD claims, which arise from a state cause of action.  *See* 28 U.S.C. § 1367.[12]

---

[10] While L.W.'s ADA claims also include failure to communicate under 28 C.F.R. § 35.160(a)(1), that regulation is merely an implementation of the ADA's prohibition on discrimination.  *See* 28 C.F.R. § 35.101(a).

[11] Even if the IDEA statute of limitations does not apply, New Jersey's two-year statute of limitations for personal injury actions would still bar these claims.  *See Disabled in Action of Pennsylvania v. Se. Pennsylvania Transp. Auth.*, 539 F.3d 199, 208 (3d Cir. 2008); N.J.S.A. § 2A:14-2(a).

[12] In any event, the NJLAD claims would likely be barred under the two-year statute of limitations for that cause of action.  *See* N.J.S.A. § 10:5-12.11.

### iii.     *Procedural Due Process*

Plaintiff seeks relief for denial of procedural due process in connection with ALJ Moscowitz's failure to consider who was authorized to advocate for L.W.'s IDEA rights (D.E. 1 ¶¶ 246–54), as well as ALJ Moscowitz's reliance upon the involvement of DYFS and the New Jersey Superior Court (*id.* ¶ 255).  However, these claims are not properly leveled against JCBE, the sole remaining Defendant in this action.

Accordingly, Defendant's motion for summary judgment is **GRANTED**.

## B.  Plaintiff's Cross-Motion for Summary Judgment

In support of her cross-motion for summary judgment, Plaintiff argues that the administrative decision reached below should be reversed on appeal.  (D.E. 42-1 at 13–15.) Specifically, Plaintiff argues that exceptions to the statute of limitations applied.  (*Id.* at 15–25; D.E. 49 at 7–12.)  Furthermore, Plaintiff argues that the evidence demonstrates Defendant's violation of the various substantive and procedural requirements of the IDEA, and that neither she nor her parents knew or should have known about these violations.  (D.E. 42-1 at 25–38; D.E. 49 at 12–21.)  As to violations of ADA, RA, and NJLAD, Plaintiff argues that these claims are distinct from the IDEA claims.  (D.E. 42-1 at 38–40; D.E. 49 at 21.)  Additionally, as to the denial of procedural due process, Plaintiff argues that the evidence demonstrates NJOAL's liability on this claim.  (D.E. 42-1 at 40–41; D.E. 49 at 21.)

As discussed, this Court does not find these arguments to be persuasive and concludes that the administrative decision below should be upheld on appeal.  Indeed, after considering the evidence submitted in connection with both the motion and the cross-motion for summary judgment, this Court has determined that L.W. and H.W. knew or should have known of the basis for the complaint; that no exceptions to the statute of limitations applied; that it did not need to

adjudicate the merits of the IDEA claims; that the ADA and RA claims were not distinct from the IDEA claims; that jurisdiction did not exist for the NJLAD claim; and that the procedural due process claim was not properly leveled against Defendant. (*See supra* at Section III.A.)

Accordingly, Plaintiff's cross-motion for summary judgment is **DENIED**.

### C. Plaintiff's Motion for Sanctions

In support of her motion for sanctions, Plaintiff argues that Defendant offered over thirty factual misrepresentations, including false statements about recipients of the IEP and the PRISE. (D.E. 53-1 at 11–14.)   Moreover, Plaintiff argues that Defendant offered numerous legal misrepresentations, including false contentions about the need for remand, the scope of the PWN requirement, the application of the stay-put rule, the appropriateness of evidence regarding policies, and the availability of home instruction. (*Id.* at 14–17.)  However, this Court finds that these alleged misrepresentations are neither patently unmeritorious nor frivolous, but largely ambiguous and subject to more than one reasonable interpretation.  In other words, no exceptional circumstances exist, even if some statements or contentions were not properly supported.

Accordingly, Plaintiff's motion for sanctions is **DENIED**.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, Defendant's motion for summary judgment is **GRANTED**, and Plaintiff's cross-motion for summary judgment and motion for sanctions are **DENIED**.


        ___*/s/ Susan D. Wigenton*___
        **SUSAN D. WIGENTON, U.S.D.J.**

Orig:   Clerk
cc:     Parties
        Michael A. Hammer, U.S.M.J.